Dominic S. Rinaldi, J.
In this article 78 proceeding petitioners seek to restrain the Board of Education from making or continuing the appointments of “ Administrators ” and “ Demonstration Elementary School Principals ’ ’ and to restrain the continuance of one Edna Gordon as Principal of P. S. 36-125 Manhattan.
Upon examination of the submitted papers I found that issues of fact existed which required a trial for determination. (See N. Y. L. J., Nov. 21,1967, p. 19, col. 5.) Afterwards, in the course of the trial, it became evident that the testimony of certain officers and employees of the Board of Education would be necessary to aid me in the ultimate disposition of the issues. It was also my belief that the public interest in the matter required that no disposition of these issues be made without the testimony of such witnesses. Accordingly I directed these officers and employees of the Board of Education to appear as witnesses *34 for the court. Their testimony, together with all other testimony, exhibits and submitted papers, leads me to conclude as follows:
1. The Board of Education did not violate any law by its appointment of ‘ ‘ Administrators ” of “ Administration Projects.”
2. The Board of Education did, in violation of the Constitution of the State of New York and the Education Law, appoint “ Demonstration Elementary School Principals.”
3. The Board of Education did not violate any law in appointing Edna Gordon as Principal of P. S. 36-125 Manhattan.
The above conclusions are based upon my finding of the following facts: The school year of 1966-1967 marked a change of interest and participation of parents in the affairs of some of their local neighborhood schools. The Board of Education had previously determined through studies that in certain communities, specifically disadvantaged areas, the performance of pupils in those schools was far below the level of pupils in other communities and that there was a definite correlation between the school’s performance and parents’ involvement in the subject schools. The board began an intensive campaign to generate greater parental and communal interest and association in the affairs of those schools where heretofore there had been apathy and a lack of concern and participation. In 1966 the voice of the Harlem community was sounded. Demand was made that the community should have unlimited domination over school personnel with the right of transfer, dismissal, appointment and assignment without regard to examinations, merit system or eligible lists. And in the early part of 1967, at P. S. 36-125 Manhattan, the parents of the Harlem community and others protested against certain aspects of the school and its program and conducted a full boycott of the school by withdrawing the children from attendance. Protests against the continued service of the principal were so strong that at one point a group in the community had to all intents and purposes locked her in her office. Eventually she asked to be relieved as principal of the school.
In this climate the Board of Education partook in many discussions concerning decentralization of schools, asking such questions as: How could we find the most practical way of involving parents, of involving community leaders — what part should be played by parent associations and by district superintendents in order to improve education — should there be additional powers vested in local groups and in parent groups — *35 what are the implications of it? To test these questions the Board of Education instructed the Superintendent of Schools on April 19, 1967 to develop a few experimental districts of varying sizes and to organize them in several ways so as to evaluate different approaches.
In various communities in the city members thereof had set up councils to plan for the attainment by the community of more influence than they ever had in local school operations. Some members of the staff of the Superintendent of Schools participated with these groups in their planning. When, in the late Spring of 1967, three projects seemed to be bearing some fruit, the Board of Education gave the Superintendent of Schools the authority to proceed toward the organization of these districts. The group representing Ocean Hill-Brownsville area in Brooklyn proposed the creation of a new position to be known as “ Administrator ” whose function would include the role of liaison between an elected board of the project area and the Board of Education’s Central Headquarters for the purpose of interpreting to the Board of Education the educational needs and aspiratioUs of the community. It was also proposed that he should have an intimate knowledge of the diverse cultural factors in the community so that he could translate such factors into feasible educational proposals readily understandable by the Board of Education. In addition it was proposed that principals appointed in certain schools should have a personal and intimate knowledge of the cultural background and diverse needs and aspirations therein.
On August 18, 1967 the Superintendent of Schools sent a telegram to the Commissioner of the State Education Department which reads, as far as pertinent, as follows:
“ The Board of Education is engaged in a number of demonstration projects under its decentralization plan in an effort to evaluate new approaches to community involvement and improvem&nt of the educational process. One of the major questions which has arisen is the .selection of principals. We wish to be as flexible as possible in our demonstration projects and we therefore tieed your opinion on certain specific questions.
“1. If we organize a demonstration project encompassing one or more schools, have we authority to select principals who have not been examined for the position by the New York City Board of Examiilers? ”
The Commissioner of Education on August 21,1967 answered question 1 as follows: “ If the project involves a high school, the answer is Yes. If it involves an elementary school, the answer *36 is No. However, for an elementary school principal in such a demonstration project, the board may designate a special Icind and grade of principal’s license, designed specifically for the project, worked out in cooperation with the community committee or committees involved, and then request the Board of Examiners to develop an appropriate examination and establish a special eligible list. The examination need not be a written one. Pending promulgation of such a list, the Board of Education may, of course, appoint a person to serve in an acting capacity. ’ ’
Upon receipt of the answer the Superintendent of Schools set about to create a demonstration project in the Ocean Hill-Brownsville area encompassing the proposals of the community. The Board of Education agreed to give the governing board of the area the right to make nominations to it of a temporary administrator and temporary principals but reserved the right to have the final authority to accept or reject the nominations. The group nominated for appointment one Bhody A. McCoy as administrator and on September 27, 1967 the Board of Education passed a resolution whereby he was appointed temporarily, effective September 5, 1967, to serve as Administrator of the Ocean Hill-Brownsville Decentralization Project. A similar resolution was also passed appointing temporarily one John A. Bremer as Administrator of the Two Bridges Model School District in Manhattan.
The Ocean Hill community also proposed that P. S. 87, P. S. 155,1. S. 178, and I. S. 55 be designated Demonstration Schools and proposed the name of a person for each school to act as principal thereof. The Board of Education approved three of the four names submitted and on September 27, 1967 passed a resolution which provided as follows:
“RESOLVED, That the position of Principal, Demonstration Elementary School, is hereby created, effective September 5, 1967, at the first year salary provided in Salary Schedule IL (Principal, Elementary School); and be it further
‘ ‘ RESOLVED, That the Superintendent of Schools be, and he is hereby, directed to prepare and submit to this Board an appropriate amendment to the Bylaws fixing license requirements for competitive examination; and be it further
“ RESOLVED, That, pending the holding of examination and establishment of an eligible list, the persons named below he, and they are hereby, appointed to serve as Acting Principal, Demonstration Elementary School, effective September 5, 1967, subject to termination by the Superintendent of Schools:

*37
Name To

Irving Gerber Demonstration Elementary School 87, Brooklyn
William H. Harris Demonstration Elementary School 178, Brooklyn (now I,S. 178 K.)
Louis Fuentes Demonstration Elementary School 155, Brooklyn
and be it further
‘ ‘ RESOLVED, That any inconsistent provisions of the Bylaws of the Board of Education be, and they are hereby, suspended.”
On November 15, 1967 a .similar resolution was passed whereby one Ralph Rogers was appointed temporarily as Demonstration Elementary School Principal of P. S. 144.
In the Two Bridges Model School District J. H. S. 65, P. S. 1, P. S. 2, P. S. 42 and P. S. 126 were designated demonstration schools. No new principals have been appointed for these schools.
The Board of Education is vested, pursuant to subdivision 2 of section 2554 of the Education Law, with the power to “ create * * * such positions * * * as, in its judg-
ment, may be necessary for the proper and efficient administration of its work; to appoint * * * employees and other
persons or experts in educational, social or recreational work or in the business management or direction of its affairs as said board shall determine necessary for the efficient management of the schools and other educational, social, recreational and business activities ”.
The record establishes that the position of “ Administrator ” is a novel creation and that no person or official within the Board of Education is performing the Administrator’s proposed function. The appointments to those positions in no way impugn the dignity of any law intended to maintain the strength of the merit system of the State of New York nor do they do violence to any law enacted for the protection of the educational system of the City and State of New York. The Board of Education had the clear statutory authority to make these appointments.
Under subdivision 2 of section 2554 of the Education Law the Board of Education has within its power also to create a new or special kind of principal in the elementary schools with *38 qualifications and duties different from those of the regular principals. In establishing the 1 ‘ Demonstration Elementary School Principals ” no duties or qualifications had been set for the position and none existed at the time the resolutions of the board appointing the four people to the positions were passed. None existed at the time of trial. As a fundamental premise, it must be recognized that it is the responsibility of the Board of Education to determine the qualifications for or duties of each position in the school system and that such determination should be made prior to the time a person is appointed thereto. The Board of Education asserts, however, that since the Demonstration Schools are experimental, the qualifications and duties of the principals are unknown to it and the appointments to the positions were made on a temporary basis specifically to determine from the performance of those appointed what the qualifications and duties should be. The appointments of those designated for the positions were based upon the requirement that the person be eligible to be certified by the State as a principal and upon recommendation of the Administrator. The Administrator was required to be satisfied that those selected by him had an intimate knowledge of the cultural background and the diverse needs and aspirations of the pupils in the disadvantaged areas. The Superintendent of Schools reviewed the nominations in the sense of seeing that there is nothing in the record to deny the jobs to the individuals, and in the absence of anything that would appear to be of disadvantage the Superintendent followed the recommendation of the Administrator.
The requirements of the State Education Department to be eligible for certification as principal are considerably less than- the requirements of the Board of Education of the City of New York. The experience requirements for a principal of an elementary school in the City of New York are five years of teaching, supplemented by three years of supervisory experience, all under appointment; three years of the experience must have been in elementary schools or junior high schools. In addition to the experience requirements there are professional requirements such as possession of a baccalaureate, 30 semester hours of graduate work and professional courses which, in a general way, are 24 semester hours in education and 8 .semester hours in supervision and administration.
None of those appointed as Demonstration School Principals except Irving Berber, is eligible to become principal of elementary schools of New York City. All eligibles on the list *39 for principal of elementary schools in New York City are eligible for State certification.
The examination out of which the eligible list for elementary school principal Avas promulgated contained many questions which invited comment on disadvantaged pupils and what the principal might do to help them. One question, heavily weighted at 70 credits, dealt specifically with the problems that a principal might encounter in a school in a disadvantaged area. The purpose of the question was to determine whether the applicants had the appropriate attitude towards pupils in such area and if they had the abilities to guide the teaching staff, to make necessary community contacts, to make the running of the school a success and to meet the educational needs of the pupils. The examination in its entirety tested each of the eligibles in depth as to the range of knowledge, intellectual traits and personality needed to cope with the multifaceted problems of any of the elementary schools in the city.
There is nothing in the record to indicate that the services to be rendered by a Demonstration principal is any different from that which is performed by an elementary school principal. And the record is indicative that the professional qualifications of the elementary school principal are at least equal to those which are required of a Demonstration School principal. I cannot accordingly vieAv the action of the Board of Education as a creation of a neAv position but see it only as a labeling of the position of elementary school principal with a new name. Such pretext may not be utilized to disregard the rights of eligibles and make other individuals not entitled to civil service protection the beneficiaries of misdirected action. The Appellate Division in Spencer v. Ryan (237 App. Div. 50, 53, affd. 262 N. Y. 600) held: “ The statute cannot be circumvented by labeling the position Avith another name, for those who had passed a competitive examination and achieved a place on the certified list Averc by laAv entitled to constitute those eligibles for appointment. That list could not be disregarded when the incumbent Avas selected.”
Resolutions cannot be adopted which flout the mandate of the Constitution that ‘ ‘ Appointments and promotions in the civil service of the state and of all the civil divisions thereof, * * * shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive”. (N. Y. Const., art. V, § 6.) The provision made by the Legislature for the enforcement of the above section of the Constitution Avith respect to principals of elementary schools in the City of New York *40 is contained in subdivision 10 of section 2573 of the Education Law. It provides that recommendations for appointment shall be from the first three persons on an appropriate eligible list prepared by the Board of Examiners. No resolution of the Board of Education is valid which is inconsistent with such provision. Each and every act performed and each and every appointment made under it are similarly invalid. Accordingly I have no hesitancy in pronouncing the appointment of Irving Gerber, William H. Harris, Louis Fuentes and Ralph Rogers invalid. It is to be noted that although Irving Gerber was on the eligible list for appointment as an elementary school principal, he was not one of the first three persons on the list and accordingly subdivision 10 of section 2573 was violated by his appointment.
The stress by the Board of Education that the schools are in an experimental stage does not alter in any manner the fact that the appointments were illegal. I cannot see why there cannot be experimentation with those on the eligible list who have already demonstrated their training, experience and devotion to educational principles. If those qualities are insufficient for the Board of Education’s purposes, it is incumbent upon it under the circumstances to reveal what else is necessary. This the board has failed to do. It is interesting to note that every principal in the Two Bridges Demonstration area is a regular licensed principal chosen from the regularly constituted eligible list. The court does not wish to and will not interfere with policy judged by educators to be sound so long as basic legal requirements are met. They have not been met here.
Near to the beginning I refer to the condition existing at P. S. 36-125 Manhattan. That school is not, like those referred to above, a Demonstration School. Now — as part of the boycott — the parents asked for a consultative voice in finding a replacement for the principal. A procedure was sought by which the Board of Education could appoint a principal for the school who would be familiar with the problems of education in disadvantaged areas and who would have the support of the local community. In the early part of 1967 Murry Hart, District Superintendent of the district which includes P. S. 36-125, communicated by mail with the first 50 or 60 persons on the eligibility list as to their interest in the position but he received no response to his letters. Thereafter Executive Superintendent of Schools, Nathan Brown, directed Assistant Superintendent of Schools Abraham Wilner to conduct a search for a principal from the existing eligible *41 list. Mr. Wilner asked a number of Assistant Superintendents and principals for names of people whom they might recommend as possible principal for the school. Mr. Wilner looked for people who had considerable experience in schools in disadvantaged neighborhoods so that it could be expected from that person, personal knowledge of such things as good - reading programs,. good programs dealing with the sociological problems that are faced by children who come from disadvantaged circumstances; or a person who had considerable experience in working with parent associations and other community agencies; or a person about whom supervisors could say that he has the capacity to work very hard, to stand up under a great deal of pressure and is "able to win people and secure their confidence in the programs that he is following. From his conversations with supervisors and principals he compiled a list of about 25 names to whom he wrote or telephoned in April, inviting them to see him with respect to the position. Fifteen came and 12 agreed to discuss the matter further with Superintendent Hart. During the interview Mr. Wilner advised them that they would eventually be required to be interviewed by a group made up of parents and that one of them would be appointed if the group and the Board of Education selected them. Among these 12 was Mrs. Edna Gordon who was an acting principal and had been an assistant principal for four years prior thereto. Within a few days Mrs. Gordon was interviewed by Superintendent Hart.
On June 23, 1967 it was agreed by the Board of Education and the parents association of the school that the board and the parents association would jointly interview applicants and that the board would appoint a principal after conferring with the parents association. Mrs. Gordon and several other people were called by Superintendent Hart to be interviewed by him and a panel of parents and community representatives on July 1, 1967. About two weeks after the interview Superintendent Hart told Mrs. Gordon that she had been unanimously approved by him and the panel and that he recommended her appointment by the Board of Education. At about that time, on July 13, the board’s Bureau of Appointment mailed a form letter to all those on the principal’s eligibility list above Mrs. Gordon’s 204th position, informing them of the position .and requiring them to notify the board by return mail if they were interested in the appointment to P. S. 36-125. The letter also stated ‘ ‘ If we do not hear from you within five days * * * it will be assumed that you are not inter *42 ested.” This letter was in accordance with the board’s practice of canvassing eligibles and is not uncommonly sent during the Summer vacation period. Within the period specified the board received responses from 15 people that they were interested. During the month of August, Superintendent Wilner called these people to his office and asked them to waive their interest in the school. He told them that since the school was under such heavy pressure, the only person who could hope to develop an educational program and lead a faculty in that program would be someone who was acceptable to and well received by the parents association together with certain other community groups and figures who had joined with the parents association. He also stressed the difficulties which the. prior principal of the school had experienced and cautioned them that such tension might interfere with their health. Mr. Wilner prevailed upon twelve to waive but three infused — -Alvin Stack, Louis R. Ricca and Irving Gerber (whom we have seen above as one of the persons who was illegally appointed as Demonstration principal of P. S. 87 in the Ocean Hill-Brownsville area). Gerber eventually waived and was appointed to P. S. 87. With Ricca and Stack being the sole available persons above Edna Gordon on the eligible list, the Board of Education was in the position to appoint her under the power vested by subdivision 10 of section 2573 of the Education Law to select one of the first three on the eligible list. On September 6 Mrs. Gordon was formally advised of her appointment.
I do not find, as the petitioners contend, that undue pressure was utilized to secure waivers from the eligibles. The eligibles were merely advised of the ‘ ‘ facts of life ’ ’— the intense pressures existing in the area- — -the threats of violence — the dangers to health and perhaps even to life of a principal forced upon the community. Advice, solicitation, argument and persuasion alone do not constitute undue pressure. The will must be overcome and make one do that which he would not understandingly do. None of the testimony reveals that those who did waive did not do so freely and by choice. Nor do I find the evidence sufficient to sustain the contention that the position offered to Irving Gerber as Principal of P. S. 87 was an inducement for him to waive with respect to P. S. 36-125. And since nothing in the law prohibits the Board of Education from soliciting waivers, I find that the appointment of Edna Gordon was legal.
While the solicitation of waivers did not overstep legal bounds, it is a practice that -should not be encouraged. The law provides *43 for a complete system of procedure designed to secure appointments to public positions of those whose merit and fitness have been determined by examinations and to eliminate as far as practicable the element of partisanship and personal favoritism in making appointments. The practice adopted here by the Board of Education could very well be employed to advance the appointment of those who might be objects of favoritism by inducing voluntary waiver in the hope of future reward and thus it may well open the door to a type of abuse' which the law was designed to prevent.
In arriving at the determination that Mrs. Gordon’s appointment was legal, I have not overlooked the contentions with respect to Mr. Elbert Krieger and Mrs. Bertha Gitjin.
Elbert Krieger returned from vacation about August 24, 1967, at which time he found the notice of July 13. On the 28th he wrote to the Board of Education requesting consideration for the position at P. ¡3. 36-125. On September 6 the board responded that because of his failure to answer throughout the Summer, he could no longer be considered for the position.
It is the frequent practice of the Board of Education to impose a limitation of 5 to 10 days to respond to a canvass for an appointment. Although the board has no rule concerning such limitation of time, it is in conformity with subdivision (b) of section 4.1 of the Rules and Regulations of the Department of Civil Service (4 NYCRR 4.1 [b]) which provides “When an eligible is canvassed for or is offered appointment in writing, and fails to state his willingness to accept such appointment within five business days after the mailing of such canvass or offer, or before the end of the second succeeding business day if such canvass or offer is sent to him by telegram, he may be considered as ineligible for purposes of making selection for such particular appointment. "
I find that it was reasonable for the Board of Education to have set a time limit for response. Obviously without a time limit appointments would necessarily be delayed and consequently the administration of the schools would be hampered. The time limit imposed is measured from the time of mailing of the notice and accordingly it is of no consequence that Mr. Krieger first became aware of it when he returned from vacation. Not having responded within the time provided for, it was reasonable for the Board of Education to assume that he waived his right to consideration for the position.
Bertha Gitlin was No. 155 on the list of eligibles. On September 28, 1967 she sent a letter to Deputy Superintendent Lang that she responded to the July 13 notice within the five *44 days but was never called for interview for the position. She claimed that the appointment of Edna Gordon was invalid and demanded consideration for the appointment. I find from the credible evidence that the Board of Education did not receive any response to the notice of July 13 from Mrs. Gitlin. It was thus reasonable for it to assume that she had waived her rights for consideration of the appointment.
The petition is accordingly granted to the extent that the appointments of Irving Gerber, William H. Harris, Louis Fuentes and Ralph Rogers are declared invalid and that the positions occupied by them are deemed vacant. The petition is denied in all other respects.