In the Matter of COUNCIL OF SUPERVISORY ASSOCIATIONS OF THE PUBLIC SCHOOLS OF NEW YORK CITY et al., Respondents-Appellants, v. BOARD OF EDUCATION OF THE CITY OF NEW YORK et al., Appellants-Respondents, and EDNA GORDON et al., Intervenors.

Second Department, November 15, 1968.

*J. Lee Rankin, Corporation Counsel (Stanley Buchsbaum, Sanford I. Freedman* and *Lawrence Cherkis* of counsel), for appellants-respondents.

*Vladeck, Elias, Frankle, Vladeck & Lewis (Max H. Frankle, Everett E. Lewis* and *Bernard Yaker* of counsel), for respondents-appellants.

*Jack Greenberg, Conrad K. Harper* and *William Bennett Turner* for Edna Gordon and another, intervenors.

*Harold J. Rothwax (Robert Sugarman* of counsel), for Parent Development Program of the Two Bridges Neighborhood Council, Inc., intervenor.

BELDOCK, P. J. This is a proceeding pursuant to article 78 of the CPLR which, *inter alia*, now seeks to review the appointment of four Principals of four designated "Demonstration Elementary Schools" in the Ocean Hill-Brownsville Demonstration Project. Originally there was also involved the appointment of Rhody A. McCoy as Administrator, Demonstration District, Ocean Hill-Brownsville Decentralization Project, and a Mrs. Gordon, appointed as Principal of Public School 36–125, Manhattan. The appeal as to Rhody A. McCoy has been withdrawn. The appointment of Mrs. Gordon was held to be valid, although she was No. 204 on the eligible list for Principal. As found by Special Term, all those on the list above her, except two, had waived their right to appointment or failed to answer letters canvassing them within the five-day limit stated in the letters. Special Term held Mrs. Gordon's appointment valid. These findings and the judgment based thereon are affirmed.

There remains for our consideration the validity of the appointment of Irving Gerber, William H. Harris and Louis Fuentes as Acting Principals of three designated Demonstration Elementary Schools, by the Board of Education upon the

recommendation of the local governing board and Acting Administrator McCoy on September 1, 1967, effective September 9, 1967, and a similar appointment of Ralph Hugo Rogers as Acting Principal of a fourth Demonstration Elementary School in the Ocean Hill-Brownsville Demonstration Project on November 15, 1967, effective November 6, 1967.

On March 17, 1964 an eligible list of 321 persons for Principal, Day Elementary School, was promulgated by the Board of Examiners in accordance with the provisions of statute (Education Law, § 2569, subd. 1). This list does not expire until March 17, 1972. The Legislature has provided that in the City of New York appointments as Principal, Day Elementary School, must be from the first three persons on eligible lists prepared by the Board of Examiners (Education Law, § 2573, subd. 10).

On September 27, 1967, the Board of Education created a new position under the title of "Principal, Demonstration Elementary School", effective September 5, 1967. The four individuals here involved were appointed under the title stated. The record discloses, and it is conceded, that, except for Gerber (as to whom the appeal has become academic), none were appointed from, nor was resort made to, the competitive eligible list then in existence. Nor did they possess the professional or academic qualifications of principals of day elementary schools.

Significantly, no standards or qualifications have as yet been set forth by the Board of Education for the new titled position of Principal, Demonstration Elementary School. However, there was testimony at the Special Term hearing that the principal of a demonstration school was required to have a knowledge of, and relationship with, disadvantaged communities and the methods of securing increased community involvement; and the ability to stimulate the members of the community; and would be required to operate a community-centered school during and after school hours.

The basic question on this appeal is whether the duties and qualifications of Principal, Day Elementary School, for which there is an outstanding civil service eligible list, are the same in essence as the duties and qualifications of the alleged new position of Principal, Demonstration Elementary School, created by the Board of Education in its resolution of September 27, 1967.

Whether the duties and qualifications of the two positions are the same is a question of fact (*People ex rel. Sweeney* v. *Rice*, 279 N. Y. 70). Special Term held (56 Misc 2d 32, 39) that the duties were the same; that the qualifications of Principal, Day Elementary School, were " at least equal " to those required of Principal, Demonstration Elementary School; and that a change

in title did not render the latter in fact a new position but only a "labeling of the position of elementary school principal with a new name." Accordingly, Special Term concluded that these appointments were invalid. I agree with the findings and conclusions below.

Neither in the legislative mandate to the Mayor of the City of New York to prepare a report and plan for school decentralization (L. 1967, ch. 484), nor in the statute approving the decentralization demonstration projects existing on April 1, 1968 as local school board districts (L. 1968, ch. 568), is there any evidence that the Legislature gave approval to the Board of Education to relax the legislative requirement that Principals of Elementary Schools be appointed from a duly promulgated eligible list. Subdivision 10 of section 2573 of the Education Law was amended many times in 1966, 1967 and 1968, before, during and after the time when decentralization legislation was under intense discussion and later enacted. In every single amendment the provision that a Principal of an elementary school in New York City shall be recommended for appointment from an eligible list prepared by the Board of Examiners was retained, with full knowledge of the creation of the decentralized demonstration projects and the demonstration elementary schools. At no time was any exception included in the statute which would permit the appointment of a Principal of a Demonstration Elementary School from other than an eligible list.

Thus, it must be concluded that the Board of Education, in creating the new position of Principal, Demonstration Elementary School, and in the appointment of Principals, Demonstration Elementary Schools, without regard to the outstanding and unexpired eligible list, acted in direct contravention of the protective guarantees afforded petitioners by the Constitution and implementing statutes; and that its action cannot be sustained.

I am fully aware that, as Ocean Hill-Brownsville is an experimental project, the Board of Education should be given some flexibility during the period of the experiment to assure the effectiveness thereof. However, it is illegal for the Board of Education, without legislative authority and without standards and qualifications for the alleged new titled position, to delegate (as was done here) to a lay governing board the power to determine the professional and educational qualifications of Principals of the schools in this community without regard to existing eligible lists and without regard to civil service examinations. The Board of Education recognized that such a procedure was not in accordance with law in its own statement of policy of April 19, 1967 when it specifically provided that Principals of

the schools in the decentralized areas would be chosen from the established eligible lists. The decentralization plan may make provisions with respect to control of budgetary funds, curriculum or control over maintenance and building needs. However, there may be no interference with the prescribed legislative procedure for the examination and appointment of supervisory or teaching personnel until the Legislature so mandates. The Legislature has not yet so provided. Even in the statute deeming decentralized demonstration projects in existence on April 1, 1968 to be local school board districts (L. 1968, ch. 568), the local board was given the power only to employ a local Superintendent of Schools, but not teaching or other supervisory personnel. If the Board of Education could provide that in this experimental district of eight schools the existing eligible list for Principal may be disregarded, there is nothing to prevent the Board of Education from saying that it will experiment with all the 650 elementary schools in the City of New York and thus disregard all existing eligible lists. No such result was intended by the Legislature and the courts may not be made the instrument to legislate such an untoward result.

I recognize the legislative mandate to implement the concept of decentralization with a plan which could reasonably be deemed to include a system of selection of personnel best qualified to stimulate and achieve community participation to the ultimate benefit of the student. However, I find nothing in this mandate or the applicable legislation enacted thus far which suggests anything even remotely permissive of a system such as is sought to be approved at bar. Absent specific legislation to that effect, I consider it the function of the court to preserve the orderly administration of the civil service system, to which preservation the determination and action of the Board of Education now under review is not conducive.

The judgment should be affirmed, without costs, except with respect to McCoy, as to whom the appeal was withdrawn.

The order dated May 9, 1968, which denied petitioners' motion to resettle the judgment should also be affirmed, without costs.

CHRIST, J. (dissenting). We agree with the majority that the appointment of Edna Gordon as Principal of Public School 36–125 was lawful and that petitioners' motion for resettlement of the judgment was properly denied. It is our opinion, however, that the Board of Education, acting under a mandate from the Legislature to assist the Mayor in the preparation of a comprehensive study and the formulation of a plan to achieve greater community initiative and participation, had a rational

basis for determining that temporary appointments of Principals to a small number of schools in an extraordinary experimental project could and should be made from persons not on the existing list of eligibles.

Under subdivision 2 of section 2554 of the Education Law, the Board of Education has the unquestioned power to create such positions as, in its judgment, may be necessary for the proper and efficient administration of its work and to appoint such persons, including Principals, as it shall determine necessary for the efficient management of the schools and other educational, social, recreational and business activities. In April, 1967, the Legislature made findings that "increased community awareness and participation in the educational process is essential to the furtherance of educational innovation and excellence in the public school system within the city of New York" (L. 1967, ch. 484). The Mayor of the City of New York was directed to prepare a comprehensive study and report and to formulate a plan for the creation and development of educational policy and administrative units within the city school district " with adequate authority to foster greater community initiative and participation * * * and to achieve greater flexibility in the administration of such schools." The Board of Education was to assist and co-operate in the preparation of the study and report and in the formulation of the plan.

Acting under this mandate, the Board of Education undertook a number of experimental projects in decentralization to evaluate new approaches to community involvement and improvement of the education process. The need for maximum flexibility in these experimental projects was clear. In August, 1967, the board inquired of the State Commissioner of Education whether, in selecting Principals for a demonstration project, it could select persons who had not been examined for the position by the New York City Board of Examiners. The Commissioner replied that under subdivision 9 of section 2554 of the Education Law the board had authority to establish experimental schools or demonstration projects for whatever educational purpose it wished. For an Elementary School Principal in such a demonstration project, the board was advised that it could designate a special kind and grade of Principal's license, " designed specifically for the project worked out in cooperation with the community committee or committees involved, and then request the Board of Examiners to develop an appropriate examination and establish a special eligible list * * *. Pending promulgation of such a list, the Board of Education may, of course, appoint a person to serve in an acting capacity."

Having received such advice from the highest education officer in the State, the Board of Education in September, 1967, created the special position of Principal, Demonstration Elementary School, and appointed three persons as Acting Principals in three demonstration schools in the Ocean Hill-Brownsville experimental project. Each of these persons met the requirements for State certification as a Principal. All such appointments were made subject to the holding of an examination and establishment of an eligible list. A fourth such appointment was made in November, 1967.

Petitioners contend that there is no difference between the position of regular Elementary School Principal and Principal of a Demonstration School and, therefore, the Board of Education could not appoint persons not on the existing list of eligibles promulgated after competitive examination. We disagree.

We are reviewing a determination by an administrative agency and it is fundamental that we may not disturb its determination unless we find it to be without rational basis or illegal (cf. *Matter of Bernhard* v. *Caso,* 19 N Y 2d 192, 197). "Certainly in the area of educational value judgments, the courts should not attempt to substitute their views for those of the board if there is some reasonable basis for the board's conclusion" (*Matter of Van Blerkom* v. *Donovan,* 22 A D 2d 71, 73, affd. 15 N Y 2d 399).

On the trial, the President of the Board of Education and the Superintendent of Schools both testified that in their judgment there were differences between the regular Elementary School Principal and the Demonstration School Principal which made resort to the existing list inappropriate. The Demonstration School Principal had to have an intimate knowledge of the community and its cultural strengths and aspirations. He had to know the means and methods by which increased community involvement and participation could be obtained. He had to have the ability to stimulate the parents, children and community at large to engage in a broader-based educational project which went beyond the school into the community itself. As the Superintendent of Schools testified, "He is going to run much more of a community centered school than we have ever asked a principal to operate."

Over and above those differences, an essential ingredient of this experiment was that the local project board would interview candidates and recommend to the Central Board those it deemed best suited for the community. The Central Board retained the power of approval or rejection of the recommendations made. If the local group were required to make its recommendation

from the first three persons on the existing list, this vital ingredient would be virtually eliminated. We think, therefore, that there was reasonable ground for the Board of Education's determination that appointment from the existing list was inappropriate for this limited, experimental project and would not promote the formulation of a new and viable plan for decentralization (cf. *Matter of Jaffe* v. *Board of Educ. of City of N. Y.*, 265 N. Y. 160, 168 [LEHMAN, J.]).

Petitioners argue that a person who passed the competitive examination for Principal of an elementary school was tested on his experience and ideas about how to deal with disadvantaged areas and that his presence on the list demonstrates that he could serve adequately in *any* elementary school in the city. The record indicates that such a conclusion is not necessarily valid. There was testimony that a person on the list could have done poorly on a heavily-weighted question dealing with a school in a " fringe " area and still have passed the examination; that many of the persons on the list did not answer an optional question dealing with a disadvantaged area; and that those on the list were not required to have had teaching or supervisory experience in a disadvantaged area school.

Moreover, it seems clear that in an experiment to increase community participation and involvement there is a personal factor which is vital to its success. If the principal appointed cannot activate the enthusiastic participation of the community in the educational process, the experiment is doomed from the outset. As Christopher Jencks, executive director of the Center for Educational Policy Research at Harvard University, recently wrote in the November 3, 1968 issue of *The New York Times Magazine*: " Most educators are now concentrating on ' compensatory ' and ' remedial ' programs to bring academic competence in all-black schools up to the level of all-white schools. Unfortunately, none of these programs have proved consistently successful over any significant period. A few gifted principals seem to have created an atmosphere which enables black children to learn as much as whites in other schools, *but they have done this by force of personality rather than by devising formulas which others could follow* " (emphasis added).

The need to accord this experimental project as much flexibility as possible was clearly demonstrated by the legislative findings presented in chapter 568 of the Laws of 1968. The Legislature stated that the need for adjusting the school structure in the city to a more effective response to the present urban educational challenge required the development of a system to insure a community-oriented approach; that " the state's dedi-

cation to and success with the principle of maximum local involvement in education suggests that it may be effective in a city having over one-third of the pupils of the state''; that it was appropriate that a detailed program for decentralization ''be formulated by the board of education of the city of New York against the background of urban educational problems''; and that any plan for the development of a community system take into account '' the educational needs of the communities and children involved, special needs of areas of low educational achievement, the ability of the community to assume the required responsibilities and initiative ''.

Under routine conditions, the distinction drawn by the board between regular Elementary School Principal and Demonstration School Principal would, in our judgment, be insufficient to provide a rational basis for the creation of the new position. The times are urgent, however, and conditions are not normal. The city is trying desperately to find out what has gone wrong with education in the deprived areas. It is reported in the November 8, 1968 issue of *Life Magazine* that, of the 8,000 children in the Ocean Hill-Brownsville area, less than one half go on to *high school*.

The experiment in Ocean Hill-Brownsville involves but eight of the 650 elementary schools in the city system. No Demonstration Principals were appointed in the two other demonstration projects because, as the President of the Board of Education testified, the board was looking for different elements in different groupings to learn different things. It did not make sense to set up three projects with identical factors which would yield but one conclusion. In our view, the limited number of these appointments in one small experimental district repels any suggestion of an intent by the board to subvert the merit system and the rights of those on the existing list.

In short, we think there was a rational basis for these appointments made by a Board of Education working under a legislative mandate to co-operate and assist the Mayor in preparing a study and formulating a plan for decentralization and maximum community involvement. These appointments were made in an extraordinary experimental project, a vital ingredient of which was the selection of the Principals of the Demonstration Schools by the local project board, subject to final approval by the Central Board. In that narrow context, distinctions too ephemeral for routine, day-to-day action take on immediate though transient substance. It seems unreasonably restrictive to us that the Board of Education, under petitioners'

interpretation, could not take even one school out of this vast system to see whether a Principal appointed from outside the list might make a difference.

The majority opinion states that none of the four individuals appointed possessed the professional or academic qualifications of Principals of day elementary schools. Each of the four, however, was eligible for State certification as Principal.

The majority also points out that the Legislature, while amending subdivision 10 of section 2573 of the Education Law, has never provided that the board could appoint a Principal to a demonstration elementary school from other than an eligible list. The Legislature's failure to do so is equally consistent, however, with recognition that the board already had the power to do so under existing law and needed no new legislation. In short, the conclusion does not follow from the premise.

The majority raises the point that if the Board of Education can provide in this demonstration district that the list may be disregarded, there is nothing to prevent it from saying it will experiment with all 650 elementary schools and, thus, disregard the entire existing list. If and when the court is required to deal with the remote possibility of a general extension of the experiment, we are certain it will be able to do so.

Nothing that we have said should suggest that the merit system of appointment mandated by the Constitution does not have relevance to decentralized schools. In any general transition from central control to decentralization, the merit system and rights vested under it must be preserved to the fullest extent possible. All that we now hold is that under the extraordinary circumstances already outlined, the Board of Education had a rational basis for deeming the existing list inappropriate for appointment of principals in this limited experimental project designed to test the effects of maximum community involvement.

The judgment appealed from should be modified to provide that the creation of the new position of Demonstration Elementary School Principal in the Ocean Hill-Brownsville District was valid.

RABIN and BRENNAN, JJ., concur with BELDOCK, P. J.; CHRIST, J., dissents from so much of the determination herewith as affirms the third and fourth paragraphs of the judgment, which adjudge that four certain appointments to the position of principal are invalid and that the positions held under those appointments are vacant; and votes to modify the judgment so as to provide that the creation of the positions in question was

valid and otherwise to affirm the judgment and order insofar as appealed from, with an opinion, in which HOPKINS, J., concurs.

Judgment affirmed, without costs, except with respect to McCoy, as to whom the appeal was withdrawn. Order dated May 9, 1968, which denied petitioners' motion to resettle the judgment affirmed, without costs.